**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:19-cr-780 |
| | ) | |
| | ) | |
| Plaintiff, | ) | CHIEF JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| LEROY BILLIPS, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Defendant Leroy Billips ("Billips") seeks suppression of evidence seized by police during a traffic stop on October 5, 2019. (Doc. No. 18 (Motion).) Plaintiff United States of America (the "government") opposes the motion. (Doc. No. 21 (Response).) The Court conducted an evidentiary hearing on July 28, 2026, and, at the conclusion of the hearing, the Court took the matter under advisement. For the reasons that follow, Billips' motion to suppress is DENIED.

## I.    BACKGROUND

Garfield Heights Police Sergeant Kenneth Falzini ("Sergeant Falzini"), a law enforcement officer with more than fourteen years of experience, testified at the hearing. Sergeant Falzini has received training in the area of criminal interdiction and is a founding member of Garfield Height's

specialized unit for criminal interdiction and violent crime reduction, which was formed in 2022.[1]

He estimates that he has participated in thousands of traffic stops.

In the early morning hours of October 5, 2019 (at approximately 12:38 a.m.), Sergeant Falzini was on duty and observed a vehicle driven by Billips traveling past him in the dark on a city street without any headlights. Recognizing that this constituted a civil traffic infraction, Sergeant Falzini turned his cruiser around, activated his overhead lights, and initiated a traffic stop. As Billips' vehicle was coming to a stop, Sergeant Falzini noticed Billips making furtive movements throughout the entire vehicle, reaching over and under the seats, and leaning backward and forward. This behavior immediately raised the sergeant's suspicion because, in his experience, such movements are often associated with trying to conceal evidence of criminal activity (like drugs) or searching for a weapon.

As he approached Billips' vehicle on foot, Sergeant Falzini noticed the smell of air fresheners or odor neutralizer emanating from the vehicle, which gave him further cause for concern, given that such items are often used to mask the scent from illegal contraband. Once he reached the passenger side of the vehicle, Sergeant Falzini could see into the vehicle and observed multiple air fresheners, including three vent clip fresheners and a Christmas tree shaped freshener hanging from the mirror, as well as a bottle in a bin near the center console labeled odor neutralizer. As he began to interact with Billips, Sergeant Falzini noticed that his hands were somewhat shaky, at first, and that he was breathing heavily throughout their exchange. Sergeant Falzini

---

[1] Sergeant Falzini currently holds the rank of detective sergeant and is a member of the Northern Ohio Fugitive Task Force. With his promotion to detective sergeant, he was also given command of the criminal interdiction unit. Prior to serving in the Garfield Heights Police Department, he was employed by the Greater Cleveland Regional Transit Authority.

2

acknowledged that it is not uncommon for people to be nervous during a traffic stop; he believed, however, that Billips appeared excessively nervous.

Sergeant Falzini also observed in Billips' lap a large sum of cash, which was folded over and tied with a rubber band. He testified that this too was suspicious, given that the bills appeared to be twenties (a common denomination for drug trafficking), and that they were folded in a manner consistent with the way drug traffickers typically transport currency. Sergeant Falzini also saw two phones in Billips' lap: a smart phone and a flip phone. From his experience and training, Sergeant Falzini knew that drug traffickers often use flip phones because they are easy to acquire without any proof of identification, difficult to trace, and typically retain less incriminating data when they are seized by law enforcement.

Sergeant Falzini was wearing a body worn camera ("BWC") during the encounter that followed, and clips from the BWC were played at the hearing. The first clip was approximately five and one-half minutes long. (Gov. Ex. 1.) The second clip, which is a continuation of the first clip, was just over seven minutes in length. (Gov. Ex. 2.) From the videos, the multiple air fresheners are clearly visible in the vehicle (Gov. Ex. 1, at :27), and Billips' heaving breathing can be seen (even through his clothing). (*See generally id*. at :16–1:50.) Billips already had his license ready and can be seen in the video offering it to the sergeant before he was asked to do so. (*Id*. at :18.) Sergeant Falzini then asked for his insurance, and Billips was able to locate proof of insurance on his smart phone. (*Id*. at :25–1:37.) Finally, he asked for the vehicle's registration, and Billips was quickly able to locate it. (*Id*. at 1:40–:47.) On cross-examination, Sergeant Falzini agreed that Billips was compliant, respectful, calm, and cooperative, as he handed over his identifying information.

3

After checking that the vin numbers on the vehicle were consistent with the information on the registration (*id.* at 1:47–2:05), Sergeant Falzini returned the registration to Billips and advised him that he would be back in a few minutes. (*Id.* at 2:05–:10.) Sergeant Falzini then returned to his vehicle where he used his vehicle's online electronic mobile data terminal to check the information Billips had provided. (*Id.* at 2:10–5:27.) He testified that, using the mobile data terminal, he checks for outstanding warrants through LEADS, as well as prior arrests and tickets, and other relevant police history associated with the vehicle and its operator. He also uses the terminal to process the traffic citations, filling in all the required information associated with the traffic stop. He testified that, depending on the circumstances of the particular stop, it typically takes him between 10 and 15 minutes to fully process a traffic stop.

Sergeant Falzini's activities in his cruiser were captured on his BWC, where he can be seen on the first video clip using the mobile data terminal. (*See generally* Gov. Ex. 1, beginning at 2:28.) While he was processing Billips' traffic stop, he also contacted Sergeant Smith and asked him to bring his police dog and perform a free air sniff because he had reason to believe that the vehicle contained evidence of criminal activity. (*Id.* at 3:32–:37.) Sergeant Smith advised that he was at the station (which was on the same road and only a short distance away) and would leave for the scene directly. (*Id.* at 3:39–:41.) While he waited, Sergeant Falzini can be seen (and heard) on the video typing on the mobile data terminal, continuing to process the stop. (*Id.* at 4:03–5:27; Gov. Ex. 2, at 0:01–3:17.)

Within five minutes of the call, Sergeant Smith arrived with his K-9 officer, Jax. Sergeant Smith instructed Sergeant Falzini on what to say to Billips and indicated that he preferred that Sergeant Falzini remove Billips from the vehicle before he performed the free air sniff with Jax.

4

(Gov. Ex. 2, at 3:47–4:02.) Per these instructions, Sergeant Falzini returned to the driver's side of the car, explained the procedure to Billips, and asked him to exit the vehicle. (*Id.* at 4:19–:33.) As Billips opened the driver's side door, Billips can be seen on the video smoking a cigar that he lit at some point during the traffic stop. (*Id.* at 4:40.) Sergeant Falzini viewed this behavior as another attempt to conceal the odor of narcotics. And once Billips exited the vehicle, Sergeant Falzini detected an odor of raw marijuana emanating from Billips' person.[2] From the BWC audio, Sergeant Falzini can be heard commenting on the strong smell of marijuana as he frisked Billips for weapons. He asked Billips if he had "weed" in his pockets, and Billips indicated that he did not. (*Id*. at 5:20–:24.) Following the frisk, Sergeant Falzini moved Billips away from the vehicle so that Jax and his handler could perform the free air sniff. Shortly thereafter, Sergeant Smith advised that Jax immediately alerted to the presence of narcotics.

Following the alert, Sergeant Falzini determined that—based on the totality of the circumstances—he had probable cause to search Billips' vehicle, and the sergeant directed Billips to his cruiser at that time. The time that elapsed from when Billips was first pulled over until the decision to search his vehicle was made was approximately 12.5 minutes. (*See* Gov. Ex. 1 and 2.) The subsequent search of the vehicle yielded a firearm under the driver's seat. Additionally, while the roadside frisk did not reveal any marijuana, a subsequent search of Billips' person following his arrest resulted in the discovery of a bag of marijuana in his underwear.

On December 18, 2019, a federal indictment was returned, charging Billips with one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1)

---

[2] Sergeant Falzini explained that raw marijuana smells like fresh herbs and has a distinct odor from burnt marijuana or cigars and cigarettes. He testified that he has received considerable training in detecting the smell of narcotics.

and 924(a)(2). (Doc. No. 1 (Indictment).) The indictment remained sealed until Billips' arrest on April 6, 2026. (*See* Doc. No. 2 (Arrest Warrant), 12/18/2019; Doc. No. 4 (Order Granting Motion to Seal Indictment); Docket Notation, 3/6/2026 (noting unsealing of indictment).) The present motion to suppress followed Billips' arraignment. (*See* Doc. No. 18.)

## II.     DISCUSSION

### A.  The Initial Traffic Stop was Lawful

It is well settled that an officer has probable cause under the Fourth Amendment to stop a vehicle when he observes a driver violate a traffic law. *United States v. Hughes*, 606 F.3d 311, 315–16 (6th Cir. 2010). The officer's internal motivation is irrelevant; "[s]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (citation omitted). Sergeant Falzini testified credibly that he observed Billips driving in the dark without headlights—a fact that Billips does not dispute—and that this constituted a traffic infraction. Accordingly, the Court finds that the initial traffic stop was lawful.

### B.  The Continuation of the Traffic Stop was Supported by Reasonable Suspicion

Police activities during an investigatory stop must be reasonably related to the circumstances that initially justified the stop. *See United States v. Sharpe*, 470 U.S. 675, 682, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) (citation omitted); *Dorsey v. Barber*, 517 F.3d 389, 398 (6th Cir. 2008) (citation omitted). During the investigatory stop, police may ask questions or request documents to establish a person's identity and to confirm or dispel suspicions of criminal activity. *See Adams v. Williams*, 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972) (citations omitted). A request to produce a driver's license and registration, and the initiation of a warrants

check upon the driver's license, also do not exceed the scope of a traffic stop. *United States v. Hill*, 195 F.3d 258, 269 (6th Cir. 1999). An officer may even ask questions unrelated to the traffic infraction so long as they do not delay the resolution of the traffic stop. *See United States v. Stepp*, 680 F.3d 651, 662 (6th Cir. 2012) (As part of an officer's traffic mission, an officer may inquire into matters unrelated to the justification for the stop "so long as those inquiries do not measurably extend the duration of the stop." (quotation marks and citation omitted)). It is also permissible for an officer to ask a motorist to exit his vehicle pending completion of an investigatory stop. *See Maryland v. Wilson*, 519 U.S. 408, 410, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997). "Simply put, 'an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'" *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (quoting *Fla. v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)).

Consistent with this authority, in investigating a traffic violation, officers may conduct a canine sniff during a lawful traffic stop as long as the sniff does not extend the duration of the stop beyond the time necessary to address the traffic violation that warranted the stop. *Rodriguez v. United States*, 575 U.S. 348, 354, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015) (citations omitted); *see United States v. Howard*, 815 F. App'x 69, 75 (6th Cir. 2020); *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) ("The Fourth Amendment does not require reasonable suspicion to justify using a drug-detection dog as long as the traffic stop and detention are not unlawful or improperly extended." (citations omitted)). But "[t]he Fourth Amendment allows police to detain a suspect on reasonable suspicion only for as long as it takes for the police to test the validity of their suspicions." *Davis*, 430 F.3d at 354, 357 (6th Cir. 2005) (noting that a constitutional initial stop can "become an impermissible seizure if it occurs over an unreasonable period of time or under

7

unreasonable circumstances" (quotation marks and citation omitted)). Where the dog sniff is over before the officer can complete the processing of the traffic stop, there can be no Fourth Amendment violation. *See, e.g., Bell,* 555 F.3d at 542 (dog sniff and questions unrelated to the traffic stop did not delay stop as the dog sniff was over before the officer received the results of background check); *Howard*, 815 F. App'x at 75; *United States v. Smith*, No. 18-cr-46, 2019 WL 1756279, at *4 (E.D. Ky. Apr. 19, 2019) (denying suppression motion under similar circumstances).

As an initial matter, the government argued at the hearing that the police did not even extend the traffic stop. Sargent Falzini requested the free air sniff while he was using the police database to confirm Billips' information, check for outstanding warrants and traffic offenses, and process the citation. The police dog and his handler arrived within five minutes, and Sergeant Falzini continued to work in his cruiser on the police monitor while he waited. The entire duration—from when Sergeant Falzini pulled Billips over to the conclusion of the dog sniff—was just 12.5 minutes. (*See* Gov. Exs. 1–2.) There is nothing to suggest that the officers extended the stop in any way, and if anything Sergeant Falzini worked expeditiously to process the traffic citation while his colleague performed the dog sniff with the K-9 officer. *See, e.g., Bell*, 555 F.3d at 543 (dog sniff and questions unrelated to the traffic stop did not delay stop); *United States v. Goins*, No. 4:20-cr-380, 2021 WL 37697, at *3 (N.D. Ohio Jan. 5, 2021) (dog sniff did not extend stop where it was completed before the officer received results of background check (citing, among authority, *Smith*, 2019 WL 1756279). The Court finds that the search was not extended by the free

8

air sniff, and, for this reason alone, the motion to suppress is denied.[3]

Alternatively, the Court finds that Sergeant Falzini had more than enough reasonable suspicion to extend the traffic stop to allow for the free air dog sniff. *See United States v. Whitley*, 34 F.4th 522, 529 (6th Cir. 2022) ("If an officer exceeds the scope or duration of the traffic stop, he must have 'reasonable suspicion' to continue the stop on unrelated grounds." (citation omitted)). Reasonable suspicion exists when an officer can "point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). "[R]easonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence[.]" *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L.E. 2d 570 (2000) (quotation marks and citation omitted). The government is correct (Doc. No. 21, at 4–5) that the Supreme Court and the Sixth Circuit have looked with disfavor on the "divide-and-conquer" approach where each fact is considered in isolation from the other facts that played into the officer's reasonable suspicion determination. *See United States v. Taylor*, 121 F.4th 590, 595 (6th Cir. 2024) (rejecting the "divide-and-conquer" approach but noting that each factor must be considered in some "orderly fashion" with "a brief discussion of each factor and its weight in the analysis" (quoting *United States v. Smith*, 263 F.3d 571, 591 (6th Cir. 2001) (further citation omitted)).

---

[3] Even if the record would have supported a finding that the traffic stop was extended by a brief period of time to perform the free air sniff, it would still pass constitutional muster. A limited delay of an already brief traffic stop does not rise to the level of a Fourth Amendment violation. *See United States v. Collazo*, 818 F.3d 247, 257–58 (6th Cir. 2016) (holding twenty-one (21) minutes was not an unreasonable amount of time to process a traffic violation during which officers also investigated suspected illegal drug trafficking).

Rather, courts look to the "totality of the circumstances" to determine whether an officer has a reasonable basis upon which to suspect criminal wrongdoing. *See United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981) (investigatory stop valid when totality of circumstances gives officers "particularized and objective basis" for suspicion of criminal activity (citations omitted)). Under this approach, the court "must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *Smith*, 263 F.3d at 588 (citation omitted); *United States v. Townsend*, 305 F.3d 537, 542 (6th Cir. 2002) (holding that the court is "charged to determine whether *the combination of factors* considered by the officer is sufficient for reasonable suspicion" (emphasis in original)).

At the hearing, Sergeant Falzini testified credibly to a number of "specific and articulable facts" that, when considered in their totality, gave him ample reasonable suspicion to extend the search. First, Sergeant Falzini testified that immediately after he initiated the traffic stop, he observed Billips making furtive movements throughout the interior of his vehicle, and that this was of great concern to him because his training informed him that such movements may be a sign that Billips was either attempting to conceal criminal activity or attempting to locate a weapon.[4] In *United States v. Ledbetter*, the Sixth Circuit found reasonable suspicion where a motorist made significant furtive movements in his vehicle when, "as officers approached the car, [defendant] was facing the passenger seat with his hands toward the center console[.]" 929 F.3d 338, 347 (6th

---

[4] On cross-examination, defense counsel questioned Sergeant Falzini regarding the level of tint on the vehicle's windows, as shown in the clips from the BWC, and expressed skepticism as to whether the sergeant was truly able to see Billips' furtive movements from a distance. Sargent Falzini testified that the BWC does not accurately portray what he was able to see using his eyes. He also explained that his vehicle is equipped with several lights, including an overhead light bar and a takedown light, that permit law enforcement to see more easily through tinted windows. The Court credits this information, as well as Sergeant Falzini's testimony that he could see through the tinting.

Cir. 2019); *see also United States v. McMullen*, 103 F.4th 1225, 1231 (6th Cir. 2024) (finding reasonable suspicion where "[t]he detectives observed [the defendant] reach for something . . . in response to their approaching truck"). In *United States v. Taylor*, a case cited by Billips, the Sixth Circuit discounted the district court's reliance on the fact that the officer saw the motorist make furtive movements because the motorist did not make these movements upon the officer's approach but, instead, made them in response to the officer's request that he locate his proof of insurance. 121 F.4th 590, 596–97 (6th Cir. 2024). Like *Ledbetter* and in contrast to *Taylor*, Sergeant Falzini testified that Billips made large, furtive movements throughout the cabin of the vehicle *before* he ever engaged Billips and asked for his license.[5] This first factor strongly supports a finding of reasonable suspicion.

Second, Sergeant Falzini noticed an excessive amount of air fresheners (at least 4) strategically positioned near vents and hanging in the car's cabin. In *Taylor*, the officer noticed multiple air fresheners hanging from the gear shaft. The court noted that "the strong odor of air fresheners during a traffic stop plays more of a supporting role to other, stronger indicators of criminal activity in making the reasonable-suspicion determination." *Taylor*, 121 F.4th at 596 (citation omitted); *United States v. Torres-Ramos*, 536 F.3d 542, 553 (6th Cir. 2008) (noting that

---

[5] At the hearing, defense counsel suggested that these furtive movements could be explained by the fact that Billips was simply retrieving his driver's license, as he had it ready for Sergeant Falzini before he asked for it. Sergeant Falzini rejected this, testifying credibly that the amount of movement exhibited by Billips was more than one would expect from an individual attempting to locate his license. Further, he testified that before he even engaged Billips, he noticed that the odor coming from the car smelled like someone had just sprayed odor neutralizer in an effort to mask an odor, and, in fact, when he looked into the vehicle he noticed a spray bottle of odor neutralizer near the center console. Under these circumstances, a reasonable officer would be entitled to infer that the movements were associated with an effort to conceal illegal activity. *See United States v. Arvizu*, 534 U.S. 266, 277, 122 S. Ct. 744, 151 L. Ed 2d 740 (2002) (holding that an officer "need not rule out the possibility of innocent conduct" in order to form a reasonable suspicion (citation omitted)); *Terry*, 392 U.S. at 22 (holding that although each individual fact forming the basis of an officer's suspicion may be "perhaps innocent in itself," reasonable suspicion nevertheless exists when all the circumstances "taken together warranted further investigation").

odor from an air freshener has a "lesser significance" in the reasonable suspicion analysis). In *Taylor*, the Sixth Circuit further discounted this fact, noting that the officer "did not indicate a strong smell of air fresheners, any trace odor of marijuana, or any other suspicious scent in Taylor's vehicle. Quite the opposite: she said she did not 'smell anything.'" *Taylor*, 121 F.4th at 596. Again, in contrast to *Taylor*, Sergeant Falzini testified credibly that he saw an excessive number of air fresheners—which was borne out by the clips from the BWC—and he also noticed the smell of odor neutralizer and observed a bottle of odor neutralizer spray in a bin near the center console. Additionally, at some point after he was pulled over, Billips lit a cigar, which Sergeant Falzini testified was further evidence that Billips was attempting to mask evidence of drug trafficking. These apparent efforts to mask or conceal the smell of narcotics, coupled with other factors, properly contributed to Sargent Falzini's reasonable suspicion. *See, e.g., United States v. Campbell*, 511 F. App'x 424, 428 (6th Cir. 2013) ("unusually strong smell of air freshener, even accounting for the two air freshener trees in the car," coupled with excessive nervousness, excessive cooperation, and history of trafficking supported extension of traffic stop to wait for K-9).

Moreover, this particular factor is reinforced by the fact that, upon Billips exiting the vehicle, Sargent Falzini immediately noticed the pungent smell of raw marijuana emanating from Billips, a fact upon which he contemporaneously commented during the weapons frisk. Indeed, the "Sixth Circuit has routinely held that detecting an odor of an illegal substance provides at least reasonable suspicion." *United States v. Lykins*, No. 12-cr-02, 2012 WL 1947346, at *9 (E.D. Ky. May 30, 2012) (collecting cases), *aff'd*, 544 F. App'x 642 (6th Cir. 2013); *see United States v. Noble*, 364 F. App'x 961, 964 (6th Cir. 2010) (smell of marijuana gave officer reasonable suspicion

12

to justify further detention under *Terry*). In fact, "the detection of a narcotic's odor, by itself, is sufficient to provide *probable cause* to conduct a lawful search of a vehicle." *United States v. Crumb*, 287 F. App'x 511, 514 (6th Cir. 2008) (emphasis added) (citations omitted).

While more is not needed to find reasonable suspicion in this instance, a number of other supporting facts further contributed to reasonable suspicion. For example, Sergeant Falzini testified that Billips appeared excessively nervous. While not as relevant as furtive movements in response to an officer's approach, "overly nervous behavior" may "contribute to a reasonable suspicion[.]" *Ledbetter*, 929 F.3d at 347 (citations omitted); *United States v. Pacheco*, 841 F.3d 384, 393 (6th Cir. 2016) (citations omitted); *but see United States v. Pedicini*, 804 F. App'x 351, 355 (6th Cir. 2020) (referring to nervousness as an "unreliable indicator" and "given little weight" in the reasonable suspicion analysis (citations omitted)); *United States v. Winters*, 782 F.3d 289, 299 (6th Cir. 2015) (similar) (collecting cases). In *Ledbetter*, the officer noticed that the motorist was "sweating profusely, breathing heavily, and had glassy eyes and 'uncontrollably' shaky hands." *Ledbetter*, 929 F.3d at 347. The court in *Ledbetter* found the driver's excessive nervousness, along with furtive movements and not stopping the vehicle immediately, sufficient to support reasonable suspicion. *Id*. at 347–48; *see also United States v. Jordan*, 100 F.4th 714, 721 (6th Cir. 2024) (nervous demeanor, including heavy breathing, and dubious travel plans supported reasonable suspicion). Similarly here, the Court credits Sergeant Falzini's testimony that he immediately noticed Billips' hands shaking when he first engaged him, and further noticed that his breathing was so labored throughout the encounter that he could see Billips' deep abdominal breathing, and this was evident from the BWC video. The Court finds that this provides at least *some* support for reasonable suspicion.

Additionally, Sergeant Falzini observed multiple cell phones in Billips' lap, including a flip phone, which Sergeant Falzini testified is often used by drug traffickers. Like nervousness, the existence of multiple cell phones today is considered a "weak" factor in the reasonable suspicion calculus. *See United States v. Townsend*, 305 F.3d 537, 544 (6th Cir. 2002). Nonetheless, the Sixth Circuit has held that the presence of several cell phones can contribute to the reasonable suspicion analysis. *Id*.

As a final factor, Sergeant Falzini observed large amounts of currency in the vehicle. The Court credits Sergeant Falzini's detailed testimony that the cash, including its denomination, and the manner in which it was folded and bound with a rubber band, was indicative of drug trafficking. Like nervousness and cell phones, large sums of cash can also give rise to reasonable suspicion in combination with surrounding circumstances.[6] *United States v. Sokolow*, 490 U.S. 1, 8–10, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989); *see also United States v. Morris*, 533 F. App'x 538, 541 (6th Cir. 2015) (noting "large amount[s] of cash" found during a traffic stop bolster reasonable suspicion); *United States v. Walton*, 258 F. App'x 753, 758 (6th Cir. 2007) (1/4 inch stack of cash was one factor in combination with others establishing reasonable suspicion).

This is not a close call. Based on a totality of the circumstances, the Court finds that there was ample evidence to support a finding of reasonable suspicion to extend the traffic stop,

---

[6] On cross-examination, defense counsel questioned Sergeant Falzini regarding whether the currency was clearly visible on the BWC video. Again, Sergeant Falzini testified credibly that the BWC does not capture what he is able to see with his eyes. He explained that the BWC sits approximately 14 inches below his eyes, and, therefore, does not display the vantage point that he sees. Additionally, he noted that the BWC is stationary and cannot follow the movement of his eyes up, down, left, and right. This inherently logical testimony was corroborated by the images from the BWC video itself, showing the view displayed from the camera, at times, obscured by the car door and/or Billips' arm. (*See* Gov. Exs. 1 and 2.) Obviously, Sergeant Falzini would have been able to see over the car door and over Billips' arm into the interior of the vehicle. Accordingly, the Court credits Sergeant Falzini's testimony that he saw folded currency in Billips' lap.

14

including Billips' (1) furtive movements; (2) excessive air fresheners, deodorizer bottle, and lit cigar, not to mention the smell of raw marijuana; (3) excessive nervousness; (4) multiple cell phones, including a flip phone; and (5) twenty-dollar bills folded and secured in a way that suggested criminal activity. *See, e.g., Ledbetter*, 929 F.3d at 347 (failing to immediately stop vehicle, furtive movements, and excessive nervousness supported reasonable suspicion); *United States v. Terrell*, 483 F. App'x 161, 165 (6th Cir. 2012) (smell of raw marijuana, multiple air fresheners, and multiple cell phones in back seat contributed to reasonable suspicion); *United States v. Winters*, 782 F.3d 289, 302 (6th Cir. 2015) (nervousness, implausible travel plans, and odd rental agreement gave rise to reasonable suspicion); *Campbell*, 511 F. App'x at 428 ("unusually strong smell of air freshener, even accounting for the two air freshener trees visible in the car[,]" coupled with excessive nervousness, excessive cooperation, and history of trafficking supported extension of traffic stop to wait for the K-9 officer).

### C. Free Air Sniff and Probable Cause

That just leaves the probable cause needed to support the search of the vehicle. It is well established that a properly trained and certified narcotics-detection dog's alert is sufficient to establish probable cause for a warrantless vehicle search. Courts have held that when a dog is certified by a bona fide organization, its alert presumptively provides probable cause unless the defense presents evidence undermining the dog's reliability. *Florida v. Harris*, 568 U.S. 237, 246–47, 133 S. Ct. 1050, 185 L. Ed. 2d 61 (2013); *United States v. Diaz*, 25 F.3d 392, 393–94 (6th Cir. 1994) (citation omitted). A defendant may challenge a dog's reliability by presenting evidence suggesting that the dog was improperly trained, influenced by its handler, or otherwise unreliable in the particular search at issue. *Diaz*, 25 F.3d at 394.

At the hearing, defense counsel represented that Billips does not challenge that Jax was properly certified and up-to-date in his training on October 5, 2019. Moreover, Sergeant Falzini confirmed that Jax had received his certification through the Ohio Peace Officer Training Academy ("OPOTA"), that he was recertified each year, and that he and his handler receive on-going monthly training. Counsel suggested, nonetheless, that Jax's positive alert provides little additional evidence to support probable cause to search Billips' vehicle. Recognizing that Ohio legalized the use of medical marijuana in 2016, defense counsel argued that the lack of any evidence that Jax could distinguish between medical marijuana and recreational marijuana on the night in question, renders his alert unreliable.

The Sixth Circuit rejected a similar argument in *United States v. Whitlow*, 134 F.4th 914 (6th Cir. 2025). In *Whitlow*, the defendant argued that, because he had a license to carry medical marijuana, the officer that searched his vehicle could not have known whether the marijuana he saw was illegally possessed. The court rejected this argument, noting that "Ohio courts agree that evidence of marijuana that could be legal medical marijuana can still provide probable cause of a state-law violation." *Id*. at 922 (collecting Ohio cases). The court further noted that there were reasons to conclude that the marijuana use was not medically related, including the nature of the residue, the existence of loose, scattered marijuana in the vehicle, and the fact that the officer knew that defendant had already lied about having marijuana. These facts, the court concluded, all "suggested illegal drug use." *Id*. at 922–93.

The evidence, here, provides an even stronger case for "suggested illegal drug use." As discussed *supra*, upon Billips exiting his vehicle, Officer Falzini could smell a strong odor of raw marijuana coming from Billips. This, combined with the aforementioned other factors—furtive

16

movements, excessive air fresheners and deodorizer, nervousness, multiple phones, and currency—would lead a reasonable officer to conclude that the marijuana was being used for illegal purposes, rather than for legitimate, medical purposes. Under the totality of these circumstances, the positive alert by the police dog established probable cause to search the vehicle. *See Harris*, 568 U.S. at 246–47; *Diaz*, 25 F.3d at 393–94 (citation omitted).

Of course, the police dog's ability to distinguish between various forms of marijuana is largely academic as, even without the positive alert, Sergeant Falzini had probable cause to search the vehicle. "Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Collazo*, 818 F.3d 247, 259 (6th Cir. 2016) (quoting *United States v. Haynes*, 301 F.3d 669, 678 (6th Cir. 2002)); *see United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) ("Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." (citations omitted)). Here, the existence of the same facts that supported a finding of reasonable suspicion—furtive movements; air fresheners, odor neutralizer, cigar, and the smell of raw marijuana; excessive nervousness; multiple cell phones; and large sums of cash—were sufficient to establish a fair probability that contraband would be located in the vehicle. *See, e.g., Terrell*, 483 F. App'x at 165 (the smell of raw marijuana, multiple air fresheners and cell phones was sufficient to establish probable cause to search a vehicle); *see also United States v. Stevenson*, 43 F.4th 641, 648 (6th Cir. 2022) (warrantless search of vehicle was valid because officer had probable cause to search due to smell of marijuana); *Crumb*, 287 F. App'x at 514 (the smell of narcotics establishes probable cause (collecting cases)).

The Court finds that probable cause supported the search, and there is, therefore, no basis

17

upon which to suppress the fruits of the search.

### III.   CONCLUSION

For the foregoing reasons, Billips' motion to suppress (Doc. No. 18) is DENIED.

**IT IS SO ORDERED**.


Dated: August 7, 2026

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**